**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,**<br>　　　　**Plaintiff,**<br><br>　　vs.<br><br>**ABDULWAHAB SHARIF MOHAMED**<br>**HASSAN,**<br>　　　**aka China,**<br><br>　　　**Defendant.** | **CASE NO. 2:20-CR-209**<br><br>**JUDGE SARAH D. MORRISON** |

**<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>**

The United States submits its Sentencing Memorandum regarding defendant Abdulwahab Sharif Mohamed Hassan, aka China, whose sentencing is set for October 15, 2021, at 10 a.m.  For the reasons below, the United States recommends that the Court impose a term of incarceration of 120 months, and a term of supervised release of three years.

## I.　　BACKGROUND

In early 2019, agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began an investigation into possible cross-border firearms trafficking from Ohio into Canada.  On August 19, 2020, following an extensive investigation, a federal Grand Jury in this District returned an Indictment charging eleven defendants in Count One with Conspiracy to Illegally Traffic Firearms, in violation of 18 U.S.C. § 371.  (*See United States v. O. Hassan*, et al., S.D. Ohio No. 2:20-cr-139, ECF No. 3, ¶ 1.)  And on November 19, 2020, a federal Grand Jury in the Southern District of Ohio returned an Indictment charging the defendant, Abdulwahab Sharif Mohamed Hassan, aka China, in Count One with Conspiracy to Illegally Traffic Firearms, in violation of 18 U.S.C. § 371, and in Counts 2 and 3 with violations of the federal straw purchase law, 18 U.S.C. § 922(a)(6).

On December 13, 2020, the Court joined these two cases.  Together, both Indictments lay out a detailed conspiracy to obtain and stockpile firearms in the Southern District of Ohio for the purpose of illegally transferring them and selling them in Canada.  As the indictments explain, the co-conspirators obtained the firearms through both legal and illegal means, stockpiled them, packed them into a void in the front compartment of Toyota Camrys, recruited female drivers to shepherd the Camrys into Canada, followed the drivers into Canada, and then arranged for the sale of the firearms in Canada.  On February 26 of this year, the defendant pled guilty to Counts 1 (conspiracy to traffic the firearms, 18 U.S.C. § 371), 2 (straw purchase, 18 U.S.C. § 922(a)(6)), and 3 (same as Count 2) of the Indictment.  As part of the plea agreement, the parties agreed to the following enhancements: a 10-level increase based upon the number of firearms; a four-level increase for firearms trafficking; a four-level increase because firearms were taken into Canada; and a four-level increase because the defendant was an organizer or leader of the scheme.

This matter is set for sentencing on September 23, 2021, at 10:00 a.m.

## II.  GUIDELINES RANGE/PRESENTENCE INVESTIGATION REPORT

The Probation Officer issued a final Presentence Report (PSR) on February 11, 2021.  According to the PSR, the total offense level (TOL) is 37, which included the following:

- Base offense level: 18 (U.S.S.G. § 2K2.1(a)(5));
- Number-of-firearms enhancement: +10 (U.S.S.G. § 2K2.1(b)(1)(E));
- Firearms trafficking: +4 (U.S.S.G. § 2K2.1(b)(5));
- Firearms left the U.S.: +4 (U.S.S.G. § 2K2.1(b)(6)(A)); and
- Organizer/leader: +4 (U.S.S.G. § 3B1.1(a));
- Less 3 points for acceptance of responsibility (U.S.S.G. § 3E1.1(b)).

The PSR further calculated the defendant's Criminal History (CH) Category as a I, with a resulting range of 210–262 months.  (PSR ¶ 95.)  The Probation Officer did not identify any factors warranting departure from the guidelines range.  (*Id.* ¶ 112.)

2

At this point, the defendant has one remaining objection to the PSR.  The Government joins that objection.  The PSR assessed the defendant with a base offense level of 18 because a number of the guns seized as part of the conspiracy were equipped with Glock conversion switches; these conversion switches make an otherwise semiautomatic handgun into an automatic handgun.  (*See, e.g.*, PSR ¶ 46.)  The PSR accurately lays out the facts at play in this case.  Nevertheless, the Government agrees that the base offense level should be a 12.  The parties did not contemplate a base offense level of 18 during the negotiation and resolution of the plea agreement.  Moreover, any discovery underpinning the facts that could be used to support a base offense level of 18 was not part of the initial rounds of discovery in this case; and the discovery that drove the parties' plea discussions and ultimate resolution of this case did not include information about Glock switches.  Finally, the Government has agreed with all other objections on this issue in the context of the PSRs of Hassan's co-defendants. It would be unjust to proceed differently in this instance.  For these reasons, the Government joins the defendant's objection regarding the base offense level.

If the Court agrees with the parties, the defendant's total offense level comes out to a 31.  With a CH of I, this would net an advisory Guidelines range of 108–135 months.

### III.     ANALYSIS AND RECOMMENDATION OF THE UNITED STATES

Sentencing requires a determination of the applicable Guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a).  *See Gall v. United States*, 552 U.S. 38, 49–50 (2007).  Under this analysis, the Government submits for the following reasons that a term of incarceration of 120 months, and a term of supervised release of three years, is fair.

A. **Nature and Circumstances: Transnational Gun Trafficking Is a Serious Crime that Puts Lives in Danger**

1. **Large-Scale, Transnational Gun Trafficking Is Serious**

A single straw purchase or illegal transfer of a firearm is "a callous and extreme risk to public safety." *United States v. Daniells*, No. 15-10150, 2017 WL 2256988, at *4 (D. Mass. May 23, 2017). The illegal transfer of a firearm is a callous and dangerous act because guns are inherently dangerous, and guns in the hands of people who shouldn't have them is even more dangerous. It is a callous and dangerous act because it skirts the regulatory framework in place to track and monitor the sale and re-sale of dangerous guns. *See United States v. Arzu*, No. 5:07 CR 166, 2007 WL 2713908, at *3 (N.D. Ohio Sept. 17, 2007) (noting that "[t]he access to firearms through illegal channels is a problem for law enforcement of immense p[ro]portions," which, in part, justifies "a sentence at the highest level of the advisory Guidelines range"). And it is a callous and dangerous act because it entails a fundamental lack of care about what happens with the guns afterwards—or to the people they hurt or even kill.

The circumstances of this case are aggravated beyond even a run-of-the-mill straw purchase or illegal transfer. First, there wasn't just one straw purchase or transfer of a gun to someone who shouldn't have it. That would be dangerous enough. But here, the defendant was one of the leaders of a conspiracy in which at least ***200 guns*** were transferred to people who shouldn't have them. The defendant's conduct therefore significantly amplified the potential danger of an illegal firearms transfer. *See United States v. Elsaddique*, 252 F. App'x 992, 993 (11th Cir. 2007) ("[The defendant] used a false name to purchase three firearms. The act alone creates a significant danger to the public, which is only increased by the possibility that he made

the purchase on someone else's behalf—someone who may have had a more serious and more recent criminal history.").

This case also involves the transnational bulk transfer of firearms, which takes it out of the rubric normally applied to a standard straw-purchase case. In this instance, Canada has seen fit to regulate firearms much more stringently than America. Fewer people have guns and fewer people can buy them. When guns from America illegally flood into Canada, our country's issues with gun violence get passed onto a neighboring country that desperately does not want them—for all the reasons laid out above. In the course of this case, the investigation further revealed that the mark-up for illegally purchased firearms can be significant in Canada—often more than five times, and up to 25 times, the retail value of the guns in the States. This represents a lucrative, difficult-to-track black market that is now creating dangers for Canadian citizens and law enforcement. The authorities in Canada also made clear during the investigation that the illegal proliferation of guns into their country was an ever-growing problem that Canadian law enforcement was working furiously to stem. Ohio, in fact, has become a priority for them, as the authorities in Canada indicated that Ohio is the number one source state for firearms recovered in crimes in Canada.

The Government respectfully submits that a sentence of 120 months is appropriate given the serious nature of the conduct at issue, and given the aggravating factors present.

### 2. The Attached Exhibits: The Defendant Put Peoples' Lives in Danger

It is not speculation that gun trafficking endangers people's lives. It is reality. Every year, innocent people who have no connection to illegal firearms are killed because of the callous act of gun trafficking.[1]

---

[1] For example, in 2018, two Westerville police officers were shot and killed by an individual who received a gun he shouldn't have from one of his friends. *See* https://www.dispatch.com/news/20181018/man-gets-5-years-for-

5

We are lucky that no one has died because of the defendant's conduct in this case—yet—that we know of.  And even though no one has been hurt or injured—yet—that we know of by the defendant's conduct, his actions have already put peoples' lives in danger.  Every time a firearm purchased in America turns up in a crime, ATF generates what's called a trace report.  The trace reports contain information about when the gun was purchased, who purchased the gun, and so on.  The trace reports also give a time-to-crime figure—that is, the time between the initial purchase of the firearm and the crime in which the firearm was involved.  People who purchase firearms tend to keep them for a long period of time, which is why the national average for time-to-crime recoveries for the calendar year of 2019 was 8.29 years.  For this reason, the shorter the time-to-crime period is—including time-to-crime periods of under a year or two—the more likely it is that the firearm was trafficked to someone who planned to use it in an illegal manner.

So far, the investigation has identified traces for 10 of the more than 200 guns trafficked by the conspiracy.  They include:

1. Two guns recovered on 5-2-2019, with a 52-day time-to-crime figure.  (Ex. 1 at 001, 003.)  The firearms were implicated in Counts 2 and 3 of the Indictment.  Mr. Hassan directly ordered the purchase of both firearms.  The firearms were found in public with ammunition nearby.  (*Id.* at 005.)

2. One gun recovered on 5-25-19, with a 161-day time-to-crime figure.  (*Id.* at 006.)  This firearm was implicated in Count 2 of the Indictment.  Mr. Hassan directly ordered the purchase of the firearm.  The individual arrested with the gun was accused of pointing a firearm at someone shortly before he was apprehended.  In the search incident to the arrest, the individual was found with three spent pistol cartridges, in addition to the gun.  A subsequent search of the vehicle uncovered Mr. Hassan's trafficked firearm located behind the lower dash area.  (*Id.* at 009–13.)  Subsequent investigation revealed

---

providing-gun-used-to-kill-2-westerville-police-officers ("Elizabeth Morelli remembered her father, Westerville Police Officer Anthony Morelli, as kind and caring and as someone who 'always went above and beyond for everyone.'  Her dad had two goals: walking her down the aisle at her wedding and spending time with his future grandkids.  A tearful Elizabeth Morelli stood before a crowded federal courtroom Thursday in Columbus, recounting her wedding ceremony earlier this year without her dad, who was fatally shot Feb. 10 while responding to a domestic disturbance call.").

that the firearm at issue was likely used in a shooting eight days prior to its recovery. (*Id.* at 014.)

3. One gun recovered on 6-14-19, with a 166-day time-to-crime figure. (*Id.* at 016.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The individual arrested with the firearm was also found to have 32 grams of heroin. (*Id.* at 019.)

4. One gun recovered on 9-25-19, with a 269-day time-to-crime period. (*Id.* at 023.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The gun was found during a search of a storage unit controlled by someone charged with drug trafficking. (*Id.* at 028.)

5. One gun recovered on 10-10-19, with a 284-day time-to-crime figure. (*Id.* at 035.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The firearm was found outside of a house after calls to law enforcement regarding gunfire near the house. Upon further search, there were spent shell casings and blood found inside the house. (*Id.* at 036–039.)

6. One gun recovered on 5-23-20, with a 510-day time-to-crime figure. (*Id.* at 40.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The firearm was found during a search related to an ongoing shooting investigation; when found, the firearm was loaded with an over-capacity magazine. (*Id.* at 42.)

7. One gun recovered on 6-1-20, with a 519-day time-to-crime figure. (*Id.* at 44.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The firearm was found after a high-speed chase in which the subjects were traveling over 100 miles per hour. Upon their arrest, one of the subjects was found with the firearm loaded, with a round in the chamber ready to fire. The subject who had the firearm also was found with upwards of half a kilo of substances believed to be cocaine, heroin, and fentanyl. In a subsequent search of the vehicle, law enforcement found drug paraphernalia and a Kevlar vest. (*Id.* at 047–049.)

8. One gun recovered on 9-18-20, with a 628-day time-to-crime figure. (*Id.* at 050.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The firearm was found after a traffic stop, during which the subject resisted arrest. The subject was found to have a bag of suspected cocaine. The firearm at issue was found loaded inside of the glove box. A subsequent related search found drug packaging material inside of a safe. (*Id.* at 052–062.)

9. One gun recovered on 12-10-20, with a 711-day time-to-crime figure. (*Id.* at 063.) This firearm was implicated in Count 3 of the Indictment. Mr. Hassan directly ordered the purchase of the firearm. The firearm was found in the context of a drug-trafficking investigation. The individuals who had the firearm were found with the following items: 542.47 grams of suspected cocaine; 7.68 grams of suspected MDMA; 299.97 grams of suspected Psilocybin; 500 tabs of LSD; several firearms; hundreds of rounds of ammunition; two hand-held electronic digital scales; and $11,200 in Canadian

7

currency.  The estimated street value of the narcotics seized was around $60,000.  (*Id.* at 065–066.)

To recap, six of the guns found had time-to-crimes of less than one year—well more than seven years below the national average, indicating that they were trafficked to people who were inclined to use them illegally.  All 10 of the guns had time-to-crimes of less than two years.  Two of the guns were found in public, with ammunition nearby.  One of the guns was shown to be used in a shooting; one of the guns was found near spent pistol cartridges; one of the guns was found after shots were reported fired; and one was found in an ongoing shooting investigation.  Several of the guns were loaded—*one with a bullet chambered.*  Five of the guns were found with drugs, near drugs, or related to drug-trafficking investigations.  And one of the guns was found near body armor.

The circumstances show that these guns were not trafficked by accident to people who didn't know what to do with them.  They were specifically trafficked to dangerous individuals— including serious drug dealers—who obtained and kept the firearms in relation to their drug trafficking activities.  The Government submits that these are aggravating factors that support its requested sentence of 120 months.

### B.  History and Characteristics: The Court Should Take Into Account the Circumstances of the Defendant's Arrest

The Government anticipates arguments from the defendant at sentencing that point to his minimal criminal history as reason for mitigation.  In the normal course, that might carry some weight.  It should carry less weight here.  The nature of this case undermines any such arguments.  Leading a conspiracy in which hundreds of guns were trafficked to another country is serious,

8

inherently dangerous conduct. The defendant has put countless peoples' lives in danger. The defendant is a dangerous person. And his involvement in this case was no accident.

The circumstances of the defendant's arrest confirm as much. Upon his arrest, law enforcement found one of the defendant's Glock pistols next to the sink at his house. Within 10 feet of the Glock was a prescription bottle, as well as a bag with two golf-ball seized amounts of marijuana. The prescription bottle contained about 2 ounces of what is known on the street as "Lean," a cough syrup comprised in part of promethazine and codeine, the latter of which is a controlled substance. Lean sells on the street in "line"-level, which is slang for an ounce, quantities. A line of Lean on the street sells for anywhere from $700 to $1,300. The name on the defendant's bottle had been ripped off; the bottle was filled the day before the defendant was arrested. In other words, the defendant was apprehended with a Glock pistol near a dealer-level amount of Lean. (*See* Ex. 2 ¶¶ 13–14.) Further indicative of the defendant's status as a narcotics dealer, the defendant reported having nearly $90,000 of cash at his disposal, despite not having a job. (PSR ¶ 92.)

The Government anticipates that the Court will be presented with two explanations at sentencing: from the defendant, that his actions are an aberration or a one-time mistake; or, from the Government, that the defendant didn't simply lead a large-scale firearms trafficking operation by happenstance, and that he instead is a serious criminal who just happened to be caught for the first time. The Government submits that the circumstances of his arrest are relevant to the Court's weighing of the above. From the view of the Government, his arrest shows that this case is not a fluke, and that he didn't just engage in the firearms trafficking for show or as a one-off transaction. Rather, the circumstances of his arrest paint the picture of a serious criminal—someone who was

9

perhaps involved in drug trafficking, someone who was definitely involved firearms trafficking, and someone who was involved deeply enough with one or both that he felt compelled to carry a serious firearm.

### C. Unwarranted Sentencing Disparities: The Defendant Was at the Top of the Conspiracy.

This is a large transnational firearms-trafficking crime, with guns that ended up in the hands of serious criminals in Canada.  This case involved hundreds of firearms.   Fourteen defendants were charged; 13 have now pled.  This is the most serious defendant the Court will sentence in this case.  He was at the top of the conspiracy.  The circumstances indicate that he was in charge, made the connections in Canada, and stood to benefit the most from the conspiracy.  His sentence should set the ceiling for everyone else in this case.

## IV.    CONCLUSION

The defendant knowingly oversaw the trafficking of a large number of guns to Canada. The circumstances indicate that he knew the guns would be put into the hands of dangerous individuals.  The guns were then put into the hands of dangerous individuals.  Only a fraction of the guns have yet been recovered.  These circumstances underscore why crimes like this have been described as callous—the defendant did all of this without caring what happened to potential victims of gun violence.  The circumstances of his arrest show that this was not a fluke—the defendant was apprehended with a firearm and a dealer amount of narcotics nearby.  He was the leader of one of the largest gun-trafficking conspiracies in this District in some time.  He is dangerous, and his sentence should reflect as much.

10

For these reasons, the Government submits that a term of incarceration of 120 months and a term of supervised release of three years would be sufficient but not greater than necessary to further the ends of sentencing.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney


*s/S. Courter Shimeall*
S. COURTER SHIMEALL (0090514)
KELLY A. NORRIS (0081254)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653
E-mail: Courter.Shimeall@usdoj.gov
E-mail: Kelly.Norris@usdoj.gov

11

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 15th day of September, 2021, electronically upon all counsel of record for defendant Abdulwahab Sharif Mohamed Hassan, aka China.

*s/ S. Courter Shimeall*
S. COURTER SHIMEALL (OH 0090514)
Assistant United States Attorney